UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JAMES NORALES,

                         Plaintiff,

            -against-

DETECTIVE WILFREDO ACEVEDO (N.Y.P.D.) SHIELD
#6499, DETECTIVE KENNETH FAULKNER (N.Y.P.D.)
SHELD #4612, ASSISTANT DISTRICT ATTORNEY
REBECCA DUNNAN, JOHN/JANE DOE POLICE
OFFICERS AND PROSECUTORS #1-10 (THE NAME(S)
JOHN/JANE DOE BEING FICTITIOUS AS THE REAL
NAME(S) ARE PRESENTLY UNKNOWN),

                         Defendants.
--------------------------------------------------------------------X

Index No.: 20-CV-02044 (DLC)

**<u>FIRST AMENDED
COMPLAINT</u>**

**<u>JURY TRIAL
DEMANDED</u>**

      The Plaintiff, complaining by his attorney(s), THE LAW OFFICE OF ANDREW L.

HOFFMAN, P.C., respectfully shows to this Court and alleges:

## <u>INTRODUCTION</u>

1. This is a civil rights action to vindicate the rights of Plaintiff James Norales, who was

   charged with attempted murder and imprisoned for almost a year, despite a total absence

   of physical evidence or reliable witness testimony to prove that he was guilty of the

   crime.

2. Mr. Norales was acquitted at trial, despite concerted efforts by the Defendants to secure a

   conviction by fabricating evidence and coercing and/or conferring benefits on a totally

   unreliable witness in exchange for her false testimony.

3. The Defendants are now being sued for their respective roles in the unconstitutional acts

   described herein.

## JURISDICTION

4. Jurisdiction is founded upon the existence of a Federal Question.

5. This is an action to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of rights, privileges, and immunities secured to the Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. Section 1983 and arising under the law and statutes of the State of New York.

6. Jurisdiction is founded upon 28 U.S.C. Sections 1331, 1343(3) and 1343(4), this being an action authorized by law to redress the deprivation under the color of law, statute, ordinance, regulation, custom and usage of rights, privileges and immunities secured to Plaintiffs by the Fourth and Fourteenth Amendments to the Constitution of the United States.

7. Individual Defendants in this action are being sued in both their individual and official capacities.

## VENUE

8. Venue lies in this District pursuant to 28 U.S.C.A. Section 1391(b) (2) since the events giving rise to the claim occurred in the Southern District.

## PARTIES

9. At all times relevant, Plaintiff James Norales was a resident of New York, New York.

10. Upon information and belief, at all times hereinafter mentioned Defendant Wilfredo Acevedo[1] was a Detective with the New York City Police Department (N.Y.P.D.) and led the investigation which resulted in the Plaintiff's false arrest and malicious prosecution.

11. Upon information and belief, at all times hereinafter mentioned Defendant Kenneth Faulkner was a Detective with the New York City Police Department (N.Y.P.D.) and participated in the investigation which resulted in the Plaintiff's false arrest and malicious prosecution.

12. Upon information and belief, at all times hereinafter mentioned Defendant Rebecca Dunnan was employed as an Assistant District Attorney of New York County, New York.

13. Upon information and belief, at all times hereinafter mentioned Defendant(s) John/Jane Doe #1-10 were employed as police officers or prosecutors in or around New York County, New York who participated in the investigation which resulted in the Plaintiff's false arrest and malicious prosecution.

14. This action arises under the United States Constitution, particularly under provisions of the Fourth and Fourteenth Amendments of the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and the rights guaranteed by the Constitution and laws of the State of New York.

---

[1] Acevedo has been a Defendant in multiple civil rights suits.  See e.g., NYPD Detective on Tessa Majors Case Sued Previously With Others For Withholding Exculpatory Evidence, Gothamist, December 22, 2019, available at https://gothamist.com/news/nypd-detective-tessa-majors-case-sued-previously-others-withholding-exculpatory-evidence.

## STATEMENT OF FACTS

### -The Crime and Initial Investigation-

15. On August 6, 2016 at about 3:43 AM, in front of 2843 8th Avenue, New York, NY, an unknown assailant shot an individual ("M.G.").

16. M.G., who had an extensive criminal history, escaped and sought treatment at Harlem Hospital.

17. When members of the NYPD investigative team, including Defendant Acevedo, arrived to question him, M.G. gave a false name and refused to provide any information about the circumstances of the shooting.

18. The team did not collect any physical evidence from the scene of the shooting, and they were unable to locate residents in the neighborhood who had any information about it.

19. Surveillance video showing the assault in its entirety was obtained and viewed by Acevedo and his team on the morning of the shooting, though as their Preliminary Investigative Worksheet reflects, the poor quality of the video made it "not good enough for facial recognition."

20. The only thing that the team could glean from the video was that the shooter was a black male who was "6'2 wearing all black thin build short hair."

21. Two individuals called 911 to report the shooting: the girlfriend of M.G., and the person who would later become the Defendants' star witness ("D.T.").

22. Both 911 callers were interviewed by police on the day of the incident.

23. M.G.'s girlfriend reported that she merely drove M.G. to the hospital but was not present for, and did not witness, the shooting.

24. D.T.—a mentally ill drug addict given to auditory and visual hallucinations who was under the influence of heroin, cocaine, and alcohol at the time of the shooting—told Acevedo that when she heard two shots,[2] she immediately ran into a nearby store, and did not see who was shooting or who was shot.

25. D.T. also consistently denied being able to identify the shooter during a two-hour interview with another member of the investigative team shortly after the incident.

26. It is on this foundation of fact that James Norales, who at 5'4 stands almost a foot shorter than the 6'2 person police initially described as the shooter, was arrested and prosecuted for attempted murder.

### -Acevedo's Initial Attempts to Recruit D.T. as a Witness-

27. With virtually nothing to go on, Acevedo determined that his best chance to obtain a conviction in the M.G. shooting would be to build a case on the word of D.T., despite her total unreliability and previous denials of having seen anything.

28. At all times relevant, Acevedo knew that D.T. had a criminal and substance abuse history which significantly undermined her credibility as a witness; for example, in 2014, she was arrested at a NYCHA building where she lied to police about her purpose for being there, provided a false name, and was found in possession of a crack pipe and a box cutter.

29. In 2007, D.T. was arrested after she was intoxicated at a 99 Cent Store, asked to leave, and responded by throwing a beer bottle into the store window, causing it to break; when questioned by police, D.T. lied and claimed someone else had thrown the bottle— specifically, D.T. implicated her own sister in the crime.

---

[2] At trial, D.T. newly recalled that she had heard "11" shots.

30. Notwithstanding, five days after the shooting, Acevedo texted D.T., "I need to speak to [you] regarding that incident.  At the same time we can try to get you some money,[3] but I have to meet with you."

31. Ten days later, after D.T. had still not complied with Acevedo's requests to meet him, Acevedo threatened her with arrest, despite there being no basis for such action.

**-The Naming of James Norales as Witness and Closing of the Case-**

32. Upon information and belief, on or about September 10, 2016, Acevedo issued an information card ("I-Card") for Norales relative to the M.G. shooting.

33. Upon information and belief, the I-Card instructed members of the N.Y.P.D. to call Acevedo if they had contact with Norales, so Acevedo could speak with him.

34. Notably, the I-Card did not identify Norales as a "suspect," but only as a "witness."

35. At all times relevant, James Norales was known to have some criminal history, and per the height listed in police records, Defendants knew Norales was far shorter than 6'2, making it impossible for him to have been the shooter observed in the video.

36. Notwithstanding, in a gross departure from minimally accepted police practices, Acevedo did not memorialize how the name "James Norales" entered the investigation in a follow-up report ("DD5"), giving rise to an inference that the source and/or content of the information was either made up, or so worthless as to not merit the effort and/or that Acevedo sought to improperly shield the unreliable source from scrutiny.

37. Shortly thereafter, with the case at an apparent standstill, the M.G. shooting investigation was closed.

---

[3] Acevedo did not specify what the source of said "money" would be.

### -The Defendants' Star Witness: D.T.-

38. On or about October 4, 2016, the Defendants' fortunes changed when D.T. sold some cocaine to an undercover police officer.

39. Upon information and belief, a warrant was issued for D.T.'s arrest, and police began knocking down the doors of D.T.'s relatives in search of her, but they were unsuccessful.

40. This was because, in D.T.'s words, she was essentially homeless at the time, "going from house to house to house, smoking and getting crack, get this, get that, overnight, da da da...take a shower, whatever."

41. Eventually, after D.T. had run out of relatives who would house her at the risk of having their doors kicked in by police, D.T.'s sister "coordinated" her surrender with officers at the 32nd Precinct.

42. Per Acevedo's threats, it was D.T.'s understanding that police wanted to arrest her as a way of incentivizing her to provide more information about the M.G. shooting—information which she had repeatedly told them she did not have.

43. In D.T.'s words, she found this particularly egregious, given that, "I don't know nothing. I don't remember nothing."

44. On October 27, 2016, at approximately 1:00PM, D.T. arrived at the 32nd Precinct, escorted by her sister—and intoxicated with heroin, cocaine, and alcohol.

45. Once there, D.T. was arrested and interrogated by various officers[4] for approximately two hours and 45 minutes—giving rise to an inference that police were not so much focused

---

[4] Plaintiff's diligent search for the identity of all N.Y.P.D. officers involved remains ongoing, particularly with regard to officers who initially had contact with D.T. on the day of her arrest. Accordingly, the Corporation Counsel is on notice that the plaintiff intends to name every officer involved as a defendant once their identities are revealed through discovery. All appropriate steps to prepare the officers' defenses and otherwise inform them that they will be individually named should be undertaken forthwith.

on D.T.'s simple drug sale to an undercover, but rather, on pressing D.T. to "cooperate" with their investigation of the M.G. shooting.

46. One or more of these officers had phone contact with Acevedo, who was not on duty, but nevertheless conferred with them about his theory that Norales had been the shooter, and Acevedo instructed them to press D.T. accordingly.

47. Following this interrogation, a visibly agitated D.T. was taken upstairs to the 32nd Precinct Detective Squad and interrogated for an additional hour by Defendant Detectives Faulkner and "Vasquez."[5]

48. Prior to D.T.'s arrival in the detective squad, as Faulkner testified, Acevedo conferred with him by phone about his theory that Norales had been the shooter, and instructed him to prepare a photo array that included Norales as the presumptive shooter.

49. Approximately 20 to 30 minutes into this second interrogation, as D.T. was beginning to show signs of drug withdrawal,[6] D.T. allegedly stated that Norales, whom she had known as a child from the neighborhood, had been the shooter.

50. About 30 minutes later, Faulkner showed D.T. the photo array and D.T. allegedly[7] identified Norales as the shooter.

51. Upon information and belief, D.T.'s arrest was then processed, and she was sent to Rikers Island where she was immediately treated for heroin and alcohol withdrawal.

---

[5] The Corporation Counsel is on notice that the plaintiff intends to name Detective Vasquez as a defendant once his full identity is revealed through discovery. All appropriate steps to prepare his defense and otherwise inform him that he will be individually named should be undertaken forthwith.

[6] At trial, D.T., a self-described addict, testified that she had taken heroin, cocaine, and alcohol prior to her October 27, 2016 arrest; she also testified that once processed and taken to Rikers Island, she was immediately treated for withdrawal for two or three days. At Plaintiff's pre-trial hearing, Faulkner repeatedly characterized D.T.'s demeanor as "emotional" and "nervous." Dunnan's 11/21/2016 notes from her proffer with D.T. acknowledge "crack/cocaine & heroin before arrested."

[7] Although D.T. would later testify that she identified Norales in the photo array, at the time of the identification, D.T. did not initial the picture she allegedly identified or write her signature on the viewing report, giving rise to an inference that she was too high and/or ill to sign, didn't make the identification, or that the identification was made under duress.

52. Notably, following D.T.'s October 27, 2016 "identification," there is no indication that the Defendants believed it had given them probable cause to arrest Norales.

53. There were no immediate[8] attempts to arrest him—no "suspect" I-Cards were issued, and no arrest warrants were sought; in fact, Acevedo did not even re-open the case.

54. Establishing probable cause to arrest Norales would require help from the district attorney's office.

**-Prosecutors' Coercion of D.T.-**

55. About a month after D.T.'s arrest, when she had sufficiently detoxed at Rikers Island, prosecutors,[9] led by A.D.A. Rebecca Dunnan, understood that D.T.'s alleged identification after a prolonged interrogation while under the influence and/or exhibiting signs of withdrawal, did not provide probable cause to arrest James Norales; accordingly, they set about the task of trying to persuade her to identify Norales as the shooter.

56. This took place primarily in the context of two interviews—the first on or about November 21, 2016, and the second on or about December 21, 2016.

57. During this time, prosecutors became aware, among other things, that D.T. had an extensive mental health history which included hospitalizations and hallucinations, an extensive history of drug and alcohol addiction, that on the day M.G. was shot D.T. was intoxicated with alcohol and heroin, that on the day D.T. was arrested and allegedly identified Norales she had been using crack cocaine and heroin, and that she had a

---

[8] Norales was not arrested until almost five months later, on March 8, 2017.
[9] The New York County District Attorney's Office is on notice that the plaintiff intends to name every prosecutor as a defendant who, in their pre-probable cause investigative capacity, participated in efforts to persuade D.T. to implicate Norales as the M.G. shooter, including, but not limited to participation in D.T.'s two proffers, once their identities are revealed through discovery. All appropriate steps to prepare their defense and otherwise inform them that they will be individually named should be undertaken forthwith.

criminal history which included incidents of lying to police and falsely implicating her own sister in one of her crimes.

58. Adding to her unreliability as a witness, *nothing* in any of the prosecutors' proffer notes reflects that D.T. saw Norales shoot anybody—only that she knew who he was and knew him as "Tyson."

59. Nevertheless, in an effort to establish probable cause to arrest Norales, which was otherwise non-existent, prosecutors proposed a coercive deal: tell the "truth" about having seen Norales shoot M.G. and have her drug case resolved with a misdemeanor and time served—or face up to nine years in jail for her felony cocaine sale to a police officer.

60. To sweeten the deal, additional incentives were added, including a phone, several meals, transportation to and from the D.A's office, and housing assistance.

61. On February 21, 2017, D.T. signed onto this deal, and she was released from custody that same day.

### -Defendants Conspire to Bolster D.T.'s False Narrative-

62. On March 7, 2017, almost five months after D.T.'s arrest and alleged identification of Norales as the shooter, and two weeks after D.T. was released from prison pursuant to her deal, Acevedo officially re-opened the investigation.

63. On March 8, 2017, James Norales was arrested by several officers ("Doe") and charged with attempted murder relative to the M.G. shooting; Acevedo was listed as the arresting officer.

64. Apparently fearing that a Grand Jury would not indict Norales for the shooting based solely on D.T.'s word, Dunnan and Acevedo hatched and executed a plan to fabricate additional evidence for the purpose of establishing probable cause.

65. The criminal complaint, drafted by Dunnan and signed by Acevedo, would not cite the narrative of the confidential informant (D.T.) as the basis for arrest—but instead falsely claim that the arrest was based on *Acevedo* recognizing Norales as the shooter in the surveillance video.

66. This was patently absurd, as Acevedo had seen the video on the night of the incident, and multiple times thereafter, and nothing in any of the investigative paperwork suggests that Acevedo or any other officer identified the shooter as Norales.

67. To the contrary, the investigative paperwork states the poor quality of the video made it "not good enough for facial recognition," describing only a black male shooter who was almost a foot taller than Norales.

68. In a ham-handed attempt to muddy the disparity in height, Acevedo falsely characterized Norales's height as 5'7, which was in conflict with his earlier, more accurate notation that Norales was just 5'4 and 140 pounds.

69. Even so, 5'7 was still seven inches too short, and did nothing to make Acevedo's claim that he recognized Norales in the surveillance video more credible.

70. Making matters worse, the fabricated complaint became the basis for prosecutors to argue at arraignment that their case against Norales was particularly strong and warranted a six-figure bail—ensuring Norales would have to fight his case as a detainee at Rikers Island.

71. Furthermore, at both Grand Jury and trial, Dunnan tailored her questions to Acevedo to help perpetuate the false impression that Acevedo had independently identified Norales as the shooter in the video.

72. Dunnan also tailored her Grand Jury examination of D.T. to conceal her initial denials of having seen the shooting, her extensive mental health history, her history of lying to police, and the tainted nature of D.T's alleged initial identification of Norales on the day of her arrest.

73. As a direct result of Defendants' bad faith and fraudulent conduct prior to, and during the Grand Jury proceedings, James Norales was indicted and imprisoned for nearly a year until his trial acquittal in late January of 2018.


**-The Trial-**

74. At trial, Acevedo admitted that he had previously offered money to D.T. if she would speak to him; he also admitted to threatening D.T. with arrest.

75. Predictably, D.T. completely unraveled on the stand, unable to sustain the false narrative she had adopted in exchange for her freedom and other benefits.

76. After admitting to the duration and magnitude of her drug and alcohol history, her criminal history (which included falsely implicating her own sister in a crime in order to evade prosecution), her history of severe mental illness which included multiple hospitalizations and hallucinations, and that she had been abusing multiple intoxicants on the day of the incident and the day of her arrest/alleged identification of Norales, D.T. admitted that she didn't know who shot M.G., stating unequivocally: "Up to this day I still say I don't know."

77.  Without much fanfare, the jury acquitted Norales, bringing a fitting end to a terrible case which never should have been brought.

## AS AND FOR THE FIRST CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST DEFENDANTS ACEVEDO AND DOE(S)

### Violation of Constitutional Rights Under Color of State Law

### —False Arrest—

78. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 77.

79. The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government officials and prohibits law enforcement officers from arresting and detaining individuals in the absence of appropriate authorization.  The Fourth Amendment also precludes police officers from conducting arrests in the absence of probable cause to believe that a crime has been committed.

80.  The actions of Defendants detailed above violated the rights of James Norales under the United States Constitution.  Given the total absence of any legitimate legal justification for the Plaintiff's arrest and the Defendant officers' blatant manufacturing of evidence, it was not objectively reasonable for the Defendant officers to arrest Mr. Norales for anything on March 8, 2017.

81.  Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of James Norales.

82.  This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

83.  As a direct and proximate result of the unconstitutional acts described above, Plaintiff James Norales has been substantially injured.

## AS AND FOR THE SECOND CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law

### —Malicious Prosecution—

84. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 83.

85. The Fourth Amendment of the United States Constitution protects citizens from overzealous and malicious prosecution by government officials without probable cause.

86. The Plaintiff was prosecuted, without probable cause, relative to the August 6, 2016 attempted murder of M.G., as set forth herein.

87. Said charges resulted in a loss of liberty for the Plaintiff, as he was incarcerated for almost one year as a result of the aforedescribed false and improper charges and incurred substantial damages as a direct result.

88. The Plaintiff's criminal proceeding was terminated in favor of the Plaintiff, as the Plaintiff was acquitted at trial in late January of 2018.

89. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of the Plaintiff.

14

90. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

91. Defendant Prosecutors, in their pre-probable cause, pre-indictment investigative capacity, advised and/or directed, and/or ratified and/or participated in the coercion of D.T., knowing D.T. was intoxicated at the time of the crime and her alleged identification of the Norales in a photo array, knowing about D.T.'s extensive mental health history, knowing about D.T.'s criminal history which included falsely implicating her own sister in a crime to evade prosecution, and threatening D.T. with substantial prison time if she did not adopt the Defendants' unfounded "truth" that Norales had shot M.G.

92. Defendant Dunnan worked intimately with Acevedo in her pre-probable cause, pre-indictment investigative capacity, drafting a false and misleading criminal complaint in coordination with Acevedo who signed it, in an effort to establish probable cause that would otherwise not exist; as such, Dunnan's conduct was not covered by absolute prosecutorial immunity.

93. Since Dunnan and prosecutors "Doe" could foresee that they would use the fabricated evidence and that a deprivation of Norales's liberty would result, the chain of causation which led to the Plaintiff's injuries was in no way broken.

94. At all times relevant, Dunnan knew the complaint and the false claims contained therein would be used to persuade the arraignment Court that the prosecution's case was strong enough to warrant a six-figure bail; Dunnan intentionally tailored questions to Acevedo at both Grand Jury and trial to amplify the false claims contained in the complaint; and Dunnan knew the false claims were material such that they would likely influence pre-

trial motions and proceedings, and ultimately a trial jury's decision if a jury were to consider it.

95. Defendants misled the grand jury, the judge and the prosecutors by creating false evidence against the Plaintiffs and thereafter providing false testimony throughout the criminal proceedings, as set forth herein.

96. At all times relevant, Faulkner knew that D.T. was in custody pursuant to a narcotics investigation, observed that her demeanor was consistent with someone under the influence/experiencing withdrawal relative to one or more intoxicants, and knew that D.T. had been at the precinct being questioned by other officers prior to being questioned by him.

97. Notwithstanding these coercive circumstances, Faulkner continued to press D.T. to identify Norales as the shooter, in coordination with Acevedo, until she allegedly succumbed; that D.T. did not initial the picture she allegedly identified or write her signature on the viewing report, gives rise to an inference that she was too high and/or ill to sign, didn't make the alleged identification, or that the alleged identification was made under duress.

98. By withholding the coercive and tainted nature of D.T.'s alleged identification of Norales, Faulkner distorted the process by which Norales was brought to trial and essentially created false information which he forwarded to prosecutors.

99. At all times relevant, it was clearly established that police and prosecutors who knowingly use false evidence to obtain a conviction act unconstitutionally, and nothing about such conduct could be deemed "objectively reasonable" as a matter of law.

100. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been substantially injured.

**AS AND FOR THE THIRD CAUSE OF ACTION**
**ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS**

**Violation of Constitutional Rights Under Color of State Law**

**-Denial of Constitutional Right to Fair Trial Due to Fabrication of Evidence-**

101. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 100.

102. Defendants created false evidence against the Plaintiffs.

103. Defendant officers forwarded false and material evidence and false information to prosecutors in the New York County District Attorney's office.

104. Defendant Prosecutors, in their pre-probable cause, pre-indictment investigative capacity, advised and/or directed, and/or ratified and/or participated in the coercion of D.T., knowing D.T. was intoxicated at the time of the crime and her alleged identification of the Norales in a photo array, knowing about D.T.'s extensive mental health history, knowing about D.T.'s criminal history which included falsely implicating her own sister in a crime to evade prosecution, and threatening D.T. with substantial prison time if she did not adopt the Defendants' unfounded "truth" that Norales had shot M.G.

105. Defendant Dunnan worked intimately with Acevedo in her pre-probable cause, pre-indictment investigative capacity, drafting a false and misleading criminal complaint in coordination with Acevedo who signed it, in an effort to establish probable cause that would otherwise not exist; as such, Dunnan's conduct was not covered by absolute prosecutorial immunity.

106. Since Dunnan and prosecutors "Doe" could foresee that they would use the fabricated evidence and that a deprivation of Norales's liberty would result, the chain of causation which led to the Plaintiff's injuries was in no way broken.

107. At all times relevant, Dunnan knew the complaint and the false claims contained therein would be used to persuade the arraignment Court that the prosecution's case was strong enough to warrant a six-figure bail; Dunnan intentionally tailored questions to Acevedo at both Grand Jury and trial to amplify the false claims contained in the complaint; and Dunnan knew the false claims were material such that they would likely influence pre-trial motions and proceedings, and ultimately a trial jury's decision if a jury were to consider it.

108. At all times relevant, Faulkner knew that D.T. was in custody pursuant to a narcotics investigation, observed that her demeanor was consistent with someone under the influence/experiencing withdrawal relative to one or more intoxicants, and knew that D.T. had been at the precinct being questioned by other officers prior to being questioned by him.

109. Notwithstanding these coercive circumstances, Faulkner continued to press D.T. to identify Norales as the shooter, in coordination with Acevedo, until she allegedly succumbed; that D.T. did not initial the picture she allegedly identified or write her signature on the viewing report, gives rise to an inference that she was too high and/or ill to sign, didn't make the alleged identification, or that the alleged identification was made under duress.

110. By withholding the coercive and tainted nature of D.T.'s alleged identification of Norales, Faulkner distorted the process by which Norales was brought to trial and essentially created false information which he forwarded to prosecutors.

111. At all times relevant, it was clearly established that police and prosecutors who knowingly use false evidence to obtain a conviction act unconstitutionally, and nothing about such conduct could be deemed "objectively reasonable" as a matter of law.

112. Defendants misled the grand jury, the judge and the prosecutors by creating false evidence against the Plaintiffs and thereafter providing false testimony throughout the criminal proceedings, as set forth herein.

113. In creating false evidence against the Plaintiff, in forwarding false evidence and information to prosecutors, and in providing false and misleading testimony, Defendant officers violated Plaintiffs' constitutional right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

114. In creating false evidence against the Plaintiffs and/or encouraging and/or directing and or ratifying officers' creation of false evidence, Defendant prosecutors violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

115. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

116. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been substantially injured.

## AS AND FOR THE FOURTH CAUSE OF ACTION
## ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

### Violation of Constitutional Rights Under Color of State Law
### -Conspiracy to Violate Plaintiff's Civil Rights-

117. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 116.

118.  Defendant officers and prosecutors (in their pre-probable cause, pre-indictment investigatory capacity), acting under color of state law in both their individual capacities

19

and as agents for the City of New York and New York County respectively, conspired together, reached a mutual understanding, and acted in concert to undertake a course of conduct violative of Plaintiffs' civil rights by:

    a.  Agreeing to deliberately and falsely arrest and maliciously prosecute the Plaintiff as set forth herein;

    b.  Agreeing to deliberately and maliciously fabricate evidence against the Plaintiff in that, *inter alia*, Dunnan drafed a false and misleading criminal complaint in coordination with Acevedo who signed it, in an effort to establish probable cause that would otherwise not exist, as set forth herein;

    c.  Agreeing to contrive false charges against the Plaintiff, as set forth herein;

    d.  Agreeing to ratify the misconduct of other officers and/or prosecutors, as set forth herein; and

    e.  Agreeing to coerce or confer benefits on D.T. in exchange for her false testimony, as set forth herein.

119. This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

120. Defendants' actions were motivated by bad faith, malice, and/or deliberate indifference to the rights of the Plaintiff.

121. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been substantially injured.

### AS AND FOR THE FIFTH CAUSE OF ACTION
### ON BEHALF OF THE PLAINTIFF AGAINST ALL DEFENDANTS

**Violation of Constitutional Rights Under Color of State Law**

**-Failure to Intercede-**

122. Plaintiff incorporates by reference and realleges each and every allegation stated in Paragraphs 1 through 121.

123. In creating false evidence against the Plaintiff, in officers' forwarding false evidence and information to prosecutors and providing false and misleading testimony, in prosecutors' creating and/or encouraging and/or directing and/or ratifying the creation of false evidence, Defendants violated Plaintiffs' constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution, and the right not to be falsely arrested and maliciously prosecuted under the Fourth Amendment.

124. The actions of Defendants detailed above violated the Plaintiffs' rights under the United States Constitution.  It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the clearly established constitutional rights of citizens from infringement by other law enforcement officers in their presence.

125. At all times relevant herein, the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures were clearly established constitutional rights that a reasonable person would have known.

126.  Defendants' actions were motivated by bad faith and malice, and/or deliberate indifference to the rights of the Plaintiff.

127.  This conduct on the part of Defendants also represents a violation of 42 U.S.C. § 1983, given that said actions were undertaken under color of state law.

128.  As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been substantially injured.

## DEMAND FOR PUNITIVE DAMAGES

129. The actions of Defendants described herein were extreme and outrageous and shock the conscience of a reasonable person.  Consequently, an award of punitive damages is appropriate to punish the Defendants.

## DEMAND FOR TRIAL BY JURY

130.        The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff James Norales requests that this Honorable Court grant him the following relief:

A.  A judgment against the Defendants for compensatory damages, and punitive damages in an amount to be determined by a properly charged jury;

B.  A monetary award for attorneys fees and costs of this action, pursuant to 42 U.S.C. § 1988;

C.  Any other relief this Court finds to be just, proper, and equitable.

Dated:  New York, New York          Respectfully Submitted By:
         September 11, 2020

                                    The Law Office of Andrew L. Hoffman, P.C.
                                    By:


                                    _____/s_____
                                    Andrew L. Hoffman, Esq.
                                    SDNY Bar Code Number: AH2961
                                    261 Madison Avenue, 12 Floor
                                    New York, New York 10016
                                    T:      (212) 736-3935
                                    E: ahoffman@andrewhoffmanlaw.com