```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
JAMES NORALES,                         :        20cv2044(DLC)
                                       :
                    Plaintiff,         :     OPINION AND ORDER
         -v-                           :
                                       :
DETECTIVE WILFREDO ACEVEDO (N.Y.P.D)   :
SHIELD #6499; DETECTIVE KENNETH        :
FAULKNER (N.Y.P.D) SHIELD #4612;       :
ASSISTANT DISTRICT ATTORNEY REBECCA    :
DUNNAN; JOHN/JANE DOE POLICE OFFICERS  :
AND PROSECUTORS #1-10 (THE NAME(S)     :
JOHN/JOHN DOE BEING FICTICIOUS AS THE  :
REAL NAME(S) ARE PRESENTLY UNKNOWN),   :
                                       :
                    Defendants.        :
                                       :
-------------------------------------- X

APPEARANCES:

For the plaintiff:
Andrew L. Hoffman
Law Offices of Andrew L. Hoffman, PC
155 East 44th Street, 6th FL
New York, NY 10017
646-585-2838

For defendants Detectives Wilfredo Acevedo and
Kenneth Faulkner:
James Jimenez
New York city Law Department
100 Church Street
New York, NY 10007
212-356-2670

For defendant Assistant DA Rebecca Dunnan:
Susan C. Roque
New York County District Attorney's Office
One Hogan Place
New York, NY 10013
212-335-9209
```

DENISE COTE, District Judge:

James Norales ("Norales") was acquitted at trial of attempted murder.  He alleges that the defendants secured his arrest and attempted to secure his conviction by coercing an unreliable eyewitness to give false testimony.  Each of the defendants has filed a motion to dismiss the complaint in its entirety.  For the reasons that follow, the motions to dismiss are granted.

## Background

The following facts are taken from the first amended complaint ("FAC") and documents properly considered on these motions to dismiss.  The alleged facts are assumed to be true.

I.   The Shooting

In the early morning hours of August 6, 2016, a male victim ("M.G.") was shot in front of 2843 8th Avenue in Manhattan.  M.G.'s girlfriend, who called 911 but did not witness the shooting, drove M.G. to Harlem Hospital.[1]

"D.T." also called 911 to report the shooting.  A member of the New York City Police Department ("NYPD") interviewed D.T. for two hours shortly after the shooting.  D.T. was under the influence of heroin, cocaine, and alcohol.  During this

---

[1] When members of the NYPD questioned M.G. at the hospital, M.G. used a false name and refused to provide information about the shooting.

interview, D.T. repeatedly stated that she was unable to
identify the shooter.

A surveillance camera captured the shooting in its
entirety.  The video shows the victim, D.T. and the shooter in
the same frame.  Defendant Detective Wilfredo Acevedo
("Acevedo") -- who led the investigation into the shooting --
and his team viewed the footage on the morning of the shooting.
An NYPD Preliminary Investigation Worksheet ("Worksheet")
reflects that the video quality was "not good enough for facial
Recognition".[2]  The Worksheet separately records, without
indicating the source of the information, that the perpetrator
was a 6'2" black male with a thin build and short hair.  Norales
is only 5'4" tall.

## II.  Efforts to Interview D.T. Between August and October

Five days after the shooting, on or around August 11,
Acevedo texted D.T.: "I need to speak to [you] regarding that
incident.  At the same time we can try to get you some money,
but I have to meet with you."  Ten days later, Acevedo had still
not met with D.T. and he threatened D.T. with arrest.  Acevedo

---

[2] The Worksheet is a single document that pulls together
information from a variety of sources regarding the
investigation of the shooting.  It is a living document with
entries added to it over time as the investigation proceeds.
One of the early entries in the Worksheet contains a description
of the surveillance video.

was aware that D.T. had a history of criminal activity and substantive abuse.

On or around September 10, before D.T. told law enforcement officers that Norales was the shooter, Acevedo issued an information card ("I-Card") for Norales in connection with the shooting of M.G.  The I-Card identified Norales as a witness and instructed members of the NYPD to contact Acevedo if they encountered Norales.

On or around October 4, a warrant for D.T.'s arrest was issued for her sale of cocaine to an undercover police officer. D.T. was "essentially homeless," and the police began "knocking down the doors of D.T.'s relatives" in search of her.

On October 27, D.T.'s sister coordinated D.T.'s surrender at the 32nd precinct.  At the time of her surrender, D.T. was under the influence of heroin, cocaine, and alcohol.  D.T. was arrested and interrogated by police officers for two hours and forty-five minutes.  Acevedo was not on duty at the time of D.T.'s arrest but was in contact with officers interrogating D.T.  Acevedo told the officers of his theory that Norales was the August 6 shooter and instructed the officers to ask D.T. about the shooting.

III. D.T. Identifies Norales in October.

After the initial interrogation, D.T. was interrogated for an additional hour by defendant Detective Kenneth Faulkner

("Faulkner") and Detective Vasquez.  Prior to this interview,
Acevedo had conferred with Faulkner by telephone and conveyed
his theory that Norales had shot M.G.  Acevedo instructed
Faulkner to prepare a photo array that included Norales.

D.T. began experiencing signs of drug withdrawal about 20
to 30 minutes into the second interrogation on October 27.
Around this time, D.T. stated that Norales, whom she had known
since he was a child, shot M.G.  Approximately 30 minutes later,
Faulkner showed D.T. a photo array that contained a photograph
of Norales and D.T. identified Norales as the shooter.  D.T. was
sent to Rikers Island ("Rikers") where she was treated for
heroin and alcohol withdrawal.

IV.  <u>The ADA Interviews D.T.</u>

On or around November 21 and again on December 21, 2016,
defendant Assistant District Attorney Rebecca Dunnan (the "ADA")
and other prosecutors conducted proffer sessions with D.T. "to
establish probable cause to arrest Norales."  The prosecutors'
notes indicate that D.T. knows Norales as "Tyson" but do not
indicate that D.T. witnessed Norales shoot anyone.

The FAC explains that the prosecutors were aware as of
these sessions that D.T. had a long history of mental health
problems, including hospitalizations and hallucinations, as well
as an extensive history of drug and alcohol addiction.  The
prosecutors also learned that D.T. was using crack cocaine and

heroin on the day she was arrested and had a criminal history that included incidents of lying to police.

The prosecutors offered D.T. a deal: if D.T. would testify truthfully, D.T.'s drug case would be resolved with a misdemeanor and time served.  If D.T. rejected the deal, she faced up to nine years in prison for her drug sale.  On February 21, 2017, D.T. and her attorney signed the deal.  She was released from custody the same day.  D.T. was also offered a telephone, several meals, transportation to and from the District Attorney's office, and housing assistance.

V.    The Arrest of Norales

On March 8, a few weeks after D.T. agreed to testify, Norales was arrested and charged with the attempted murder of M.G.  The ADA drafted the criminal complaint against Norales, and Acevedo signed the complaint.  The complaint omits any reference to D.T. or D.T.'s identification of Norales.  In the complaint, Acevedo states in part:

> The factual basis for these charges are [sic] as follows: I have reviewed video from outside of 2843 8th Avenue from August 6, 2016 at approximately 3:40AM.  The video depicts the defendant approach an individual known to the District Attorney's Office and pull out what appears to be a firearm.  I observed the defendant fire the weapon in the direction of [that] individual . . . .

(Emphasis added.)

Prosecutors requested that bail be set at a six-figure amount.  The transcript of the bail argument reflects that the

state justified its bail request by referring to Norales'
criminal history, the strength and seriousness of the case, his
prior criminal contacts, and his history of not coming to court.
Both Acevedo and D.T. testified before the Grand Jury, which
indicted Norales for the shooting.

## VI.  The January 2018 Trial

Norales remained imprisoned for nearly a year as he awaited
trial.  At the trial, which was held in January of 2018, Acevedo
admitted offering money to D.T. if she would speak with him, and
he admitted threatening D.T. with arrest.  In her testimony,
D.T. described her drug and alcohol history, criminal history,
history of mental illness, and use of multiple intoxicants on
the day of the shooting and the day of her arrest and
identification of Norales.  D.T. repeatedly identified Norales
as the shooter during her trial testimony.  But the FAC contends
that D.T. also testified "that she didn't know who shot M.G.,
stating unequivocally: 'Up to this day I still say I don't
know.'"  The jury acquitted Norales.

## VII. Procedural History

On March 6, 2020, Norales filed this § 1983 action.  On
August 6, defendants filed motions to dismiss and on September
11, Norales responded by filing the FAC.

The FAC asserts claims pursuant to § 1983.  Against all
defendants, it alleges claims for (1) malicious prosecution; (2)

denial of Norales' right to a fair trial due to fabrication of
evidence in violation of the Fifth, Sixth, and Fourteenth
Amendments; (3) conspiracy to violate his constitutional rights;
and (4) failure to intervene.  The FAC alleges a claim for false
arrest in violation of the Fourth Amendment against Acevedo.

On October 6, the defendants renewed their motions to
dismiss.  The ADA moves to dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6) and on grounds of Eleventh Amendment
immunity, absolute prosecutorial immunity, and qualified
immunity.  The two detective defendants move to dismiss pursuant
to Rule 12(b)(6) and on the ground of qualified immunity.  The
motions became fully submitted on November 24, 2020.

## Discussion

When deciding a motion to dismiss under Rule 12(b)(6), Fed.
R. Civ. P., a court must "constru[e] the complaint liberally,
accept[] all factual allegations as true, and draw[] all
reasonable inferences in the plaintiff's favor."  Coal. for
Competitive Elec., Dynergy Inc. v. Zibelman, 906 F.3d 41, 48–49
(2d Cir. 2018) (citation omitted).  To survive a motion to
dismiss, "a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible
on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)
(citation omitted).  A complaint must do more than offer "naked
assertions devoid of further factual enhancement," and a court

is not "bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

In determining the adequacy of a complaint, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). In addition, "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (citation omitted). A court may also take judicial notice of facts that are publicly available if their accuracy cannot reasonably be questioned. See Fed. R. Evid. 201(b); Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 60 (2d Cir. 2016). "[W]hen the complaint alleges that . . . a document made a particular representation, the court may properly look at the document to see whether that representation was made." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

In their motions, the defendants have presented and relied on the following exhibits: (1) the surveillance video of the shooting; (2) the NYPD Preliminary Investigation Worksheet; (3) D.T.'s proffer agreement; (4) the transcript of D.T.'s plea allocution; (5) the criminal court complaint against Norales; (6) grand jury testimony related to the indictment of Norales; (7) the transcript of Norales' arraignment; (8) excerpts of the transcript of a pretrial hearing for Norales; (9) excerpts of the Norales trial transcript; and (10) arrest photos of Norales.

Of relevance to this Opinion, Norales contends that the Court should not consider the surveillance video, D.T.'s proffer agreement or the excerpts of the trial testimony.[3]  The FAC, however, contains assertions about the video, the substance of D.T.'s agreement and the trial testimony.  As a result, these exhibits are properly considered as incorporated by reference and, in the case of the trial testimony, as also publicly available facts.[4]

---

[3] Norales objects as well to the submission of D.T.'s plea allocution, the excerpts from the pre-trial hearing, and the arrest photographs of Norales.  Because this Opinion does not rely on those exhibits, it is unnecessary to discuss them further.

[4] The trial testimony has only been relied upon to add that D.T. did identify Norales repeatedly at trial as the person she observed shooting M.G.  This fact, which was omitted from the FAC, does not appear to be in dispute.

I.   ADA Dunnan

The ADA contends that she has absolute immunity for the claims in the FAC.  She is correct.

"Absolute immunity bars § 1983 suits against prosecutors for their role in initiating a prosecution and in presenting the State's case."  Ogunkoya v. Monaghan, 913 F.3d 64, 69 (2d Cir. 2019) (citation omitted).  Prosecutors receive absolute immunity when they perform functions that are "intimately associated with the judicial phase of the criminal process."  Van de Kamp v. Goldstein, 555 U.S. 335, 343 (2009) (citation omitted)).  "Instead of relying on strict categories of actions with respect to which absolute immunity attaches, the relevant question is" whether a prosecutor "acts as an advocate" either in a pending court proceeding or in preparation for one.  Ogunkoya, 913 F.3d at 69 (citation omitted).  "[T]he duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution," as well as "actions apart from the courtroom."  Id. (citation omitted).

Courts apply a "functional approach" in determining whether absolute immunity attaches.  Victory v. Pataki, 814 F.3d 47, 65 (2d Cir. 2016).  "[P]rosecutors receive only qualified immunity when performing administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings."

Simon v. City of New York, 727 F.3d 167, 172 (2d Cir. 2013) (citation omitted).

In contrast, "administrative or investigative acts" that are "integral to the overarching advocacy function" are protected by absolute immunity.  Ogunkoya, 913 F.3d at 70 (citation omitted).  See also Giraldo v. Kessler, 694 F.3d 161, 166 (2d Cir. 2012) (investigative acts reasonably related to decisions whether or not to begin a prosecution entitled to absolute immunity).  The relevant question is "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor."  Ogunkoya, 913 F.3d at 69.  This is true "even in the face of a complaint's allegations of malicious or corrupt intent behind the acts."  Giraldo, 694 F.3d at 166.

The FAC asserts that the ADA first interviewed D.T. about one month after D.T. had identified Norales as the shooter when shown a photospread with his photograph.  By the time of the interview, D.T. had detoxed while at Rikers.  After the ADA's proffer sessions with D.T., at which D.T. apparently confirmed the identification, Norales was arrested on a complaint that the ADA drafted.  The ADA then called D.T. and Acevedo as witnesses before the Grand Jury and at trial.  Each of these activities embodies a core prosecutorial function, and the ADA is entitled to absolute immunity for each of them.  The proffer sessions

with D.T. informed the decision whether to institute the prosecution of Norales.  Drafting a criminal complaint against Norales is "intimately associated with the judicial phase of the criminal process."  Van de Kamp, 555 U.S. at 343 (citation omitted).  Finally, the examinations of Acevedo and D.T. before the grand jury and at trial fall squarely within the prosecutor's role.  See Simon, 727 F.3d at 171.

Norales contends that the ADA is not entitled to absolute immunity since, in essence, D.T.'s identification testimony was unreliable.  The doctrine of absolute immunity rests, however, on a determination of what function the ADA was performing at each of these stages in the Norales prosecution.  Nothing presented in the FAC or even in the plaintiff's brief in opposition to these motions suggests that the ADA was functioning other than as a prosecutor in connection with each of these activities.

II.  Detectives Acevedo and Faulkner

Acevedo and Faulkner have moved to dismiss each of the § 1983 claims against them.  Section 1983 provides a cause of action for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  In other words, "[t]o state a claim under §

13

1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." <u>McGugan v. Aldana-Bernier</u>, 752 F.3d 224, 229 (2d Cir. 2014).

Acevedo and Faulkner move to dismiss each of the claims pursuant to Rule 12(b)(6) and on the ground of qualified immunity. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." <u>D.C. v. Wesby</u>, 138 S. Ct. 577, 589 (2018) (citation omitted). <u>See also Jones v. Treubig</u>, 963 F.3d 214, 224 (2d Cir. 2020). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." <u>Wesby</u>, 138 S. Ct. at 589. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Hurd v. Fredenburgh</u>, 984 F.3d 1075, 1089 (2d Cir. 2021) (citation omitted).

A. False Arrest

Norales alleges that Acevedo violated his Fourth Amendment rights by arresting and detaining him without probable cause and by manufacturing evidence against him to justify the arrest. A false arrest claim requires a plaintiff to allege "(1) the

defendant intended to confine the plaintiff, (2) the plaintiff
was conscious of the confinement, (3) the plaintiff did not
consent to the confinement and (4) the confinement was not
otherwise privileged." Liranzo v. United States, 690 F.3d 78,
95 (2d Cir. 2012) (citation omitted). "To avoid liability for a
claim of false arrest, an arresting officer may demonstrate that
either (1) he had probable cause for the arrest, or (2) he is
protected from liability because he has qualified immunity."
Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015).

Officers have "probable cause when they have knowledge or
reasonably trustworthy information of facts and circumstances
that are sufficient to warrant a person of reasonable caution in
the belief that the person to be arrested has committed or is
committing a crime." Hernandez v. United States, 939 F.3d 191,
199 (2d Cir. 2019) (citation omitted). A law enforcement
official has probable cause to arrest if the officer "received
information from some person, normally the putative victim or
eyewitness, unless the circumstances raise doubt as to the
person's veracity." Betts v. Shearman, 751 F.3d 78, 82 (2d Cir.
2014) (citation omitted). Information from a person who was
present when shots are fired can support a finding of probable
cause to arrest. See, e.g., Frost v. New York City Police
Dep't, 980 F.3d 231, 243-44 (2d Cir. 2020) (collecting cases).
"Probable cause is determined on the basis of facts known to the

arresting officer at the time of the arrest." Shamir v. City of New York, 804 F.3d 553, 557 (2d Cir. 2015) (citation omitted). See also Wesby, 138 S. Ct. at 586 ("To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." (citation omitted)). The arresting officer is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Garcia v. Does, 779 F.3d 84, 93 (2d Cir. 2015) (citation omitted).

An officer is entitled to qualified immunity so long as "arguable probable cause existed to arrest." Dufort v. City of New York, 874 F.3d 338, 354 (2d Cir. 2017) (citation omitted). A police officer has arguable probable cause if "(a) it was objectively reasonable for the officers to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Franco v. Gunsalus, 972 F.3d 170, 176 (2d Cir. 2020) (citation omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed." Figueroa v. Mazza, 825 F.3d 89, 100 (2d Cir. 2016) (citation omitted).

Based on the allegations in the FAC and the documents integral to it, probable cause existed to arrest Norales.  An eyewitness who knew Norales, who was at the scene of the shooting, and who called 911 at the time of the shooting identified Norales as the shooter.  D.T. identified Norales as the shooter when shown a photospread with Norales' photograph and, following detoxification, confirmed the identification when interviewed by the ADA.  It was only after D.T. was interviewed by the ADA, executed a proffer agreement, and agreed to testify at trial, that the ADA authorized the arrest of Norales.  At the very least, arguable probable cause existed for the arrest of Norales, and Acevedo is entitled to qualified immunity because officers of reasonable competence could disagree on whether the probable cause existed.

Norales concedes that D.T. was a longstanding acquaintance of Norales and that D.T. even knew his nickname but contends that D.T.'s identification of him as the shooter did not supply probable cause for his arrest since D.T. was on drugs at the time of the shooting, had denied at first the ability to identify the shooter, and had a history of lying to the police. An officer's knowledge that a witness to a crime may have lied in the past, even about the person who is arrested, and that the witness was under the influence of drugs or alcohol at the time of the crime, does not mean that the officer cannot rely on the

witness in determining whether there is probable cause to make an arrest.  Based on the facts alleged in the FAC and the documents integral to that pleading, Acevedo had probable cause to arrest Norales, and certainly had arguable probable cause to do so.  See Garcia, 779 F.3d at 93; Betts, 751 F.3d at 82-83.

Norales next contends that D.T.'s pre-arrest identifications of Norales do not provide even arguable probable cause for his arrest because they were coerced.  Norales points to the threats made to D.T. that the police would arrest her for her sale of drugs, their alleged harassment of D.T.'s relatives while they searched for D.T., and the threat that she was facing nine years in prison for her drug dealing.  Again, information supporting probable cause to make an arrest may be supplied from witnesses with criminal records of their own, witnesses who are facing their own criminal charges, and witnesses who have agreed to cooperate with prosecutors in the hope of reducing their exposure to imprisonment.  See United States v. Rollins, 522 F.2d 160, 164 (2d Cir. 1975) ("Specific allegations of reliability or past reliable contact are not required when the informant in question was an eyewitness to the crime.")  Cf. United States v. Canfield, 212 F.3d 713, 721 (2d Cir. 2000) (probable cause existed to issue search warrant despite witness' criminal record, and witness' criminal history did not reflect on his/her veracity).

Finally, Norales contends that D.T.'s renunciation of her identification during the trial shows that there was no probable cause for his arrest.  This ex post facto event does not alter the conclusion that Norales has failed to allege that his arrest was not "otherwise privileged".  Judged from the date of his arrest on March 8, 2017, the FAC and documents integral to it indicate that Acevedo had ample probable cause to arrest Norales.

B. Malicious Prosecution

A plaintiff bringing a malicious prosecution claim must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Frost, 980 F.3d at 242 (citation omitted).  "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution."  Id. (citation omitted).  "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases."  Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013).  "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to

believe the plaintiff guilty." <u>Frost</u>, 980 F.3d at 243 (citation omitted).

"[P]olice officers do not generally commence or continue criminal proceedings against defendants." <u>Bermudez v. City of New York</u>, 790 F.3d 368, 377 (2d Cir. 2015) (citation omitted). A plaintiff can maintain a claim for malicious prosecution against a police officer "if the officer is found to play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." <u>Id</u>. Additionally, "when a plaintiff pursues a claim of malicious prosecution against police officers based on an unlawful arrest, the intervening exercise of independent judgment by a prosecutor to pursue the case usually breaks the chain of causation unless the plaintiff can produce evidence that the prosecutor was misled or pressured by the police." <u>Dufort v. City of New York</u>, 874 F.3d 338, 352 (2d Cir. 2017) (citation omitted).

As with false arrest, "probable cause is a complete defense" to malicious prosecution. <u>Mara v. Rilling</u>, 921 F.3d 48, 73 (2d Cir. 2019). As a result, police officers are entitled to qualified immunity against a malicious prosecution claim if probable cause exists. <u>Id</u>. Officers are also entitled to qualified immunity if there was "arguable" probable cause to arrest. <u>Betts v. Shearman</u>, 751 F.3d 78, 83 (2d Cir. 2014).

As explained above, the FAC alleges that the prosecution of Norales did not commence until D.T. had undergone a detox at Rikers, was interviewed by the ADA on two separate occasions, and had executed a proffer agreement with the District Attorney's Office in which D.T. agreed to testify at trial. After D.T. testified before the grand jury, Norales was indicted. The ADA's exercise of independent judgment, therefore, broke the chain of causation for any malicious prosecution claim against either defendant Detective. The FAC states as well that even before Norales was arrested, the ADA was aware that D.T.'s initial identification of Norales occurred while D.T. was still under the influence of drugs and aware as well of D.T.'s history with mental health issues, addiction, and crime. There is no allegation that the police misled the ADA about D.T.'s reliability as a witness. But even if the chain of causation had not been broken, the claims against the defendant Detectives for malicious prosecution would have to be dismissed because there was probable cause for the Norales prosecution and certainly arguable probable cause for that prosecution.

Norales argues in opposition to this motion to dismiss that the Detective defendants misled the ADA. The FAC, however, has not alleged that they misled the ADA or explained how they did so. The FAC describes instead an independent interview of D.T. by an ADA who had a full understanding of the difficulties in

assessing D.T.'s credibility and the challenges that would be presented in using D.T. as the sole eyewitness to the shooting.

In support of the malicious prosecution claim, Norales principally contends that the FAC states such a claim against Acevedo when it alleges that the ADA and Acevedo conspired together to create the "false" criminal complaint that initiated this prosecution.  The FAC alleges that the ADA drafted the complaint that Acevedo signed and that the complaint falsely asserts that Acevedo recognized Norales as the shooter in the surveillance video.  The FAC explains that this was a false statement since the Worksheet indicates both that the surveillance video was "not good enough for facial Recognition" and that the black male shooter was almost a foot taller than Norales.[5]

The facts alleged in the FAC do not permit any fair inference to be drawn that Acevedo's statement in the arrest complaint that the video depicts Norales firing a weapon is false.  The relevant passages from the Worksheet and the arrest complaint, which are incorporated by reference in the FAC, have been quoted above.  First, the arrest complaint is clear that

---

[5] As noted above, the Worksheet's entry at an early stage of the investigation describing the shooter as "6'2 wearing all black thin build short hair" does not indicate the source of that information.  The Worksheet's separate entry regarding the surveillance video does not contain any estimate of the shooter's height other than to say he is "tall and thin".

Acevedo is describing his observation of the video as of the date he signed the complaint, which is seven months after the shooting.  In those intervening months, D.T. had identified Norales as the shooter and identified his photograph in a photospread.  The Worksheet's indication at the beginning of the investigation that the video's quality was not good enough for facial "Recognition", an apparent reference to the likelihood of identifying an unknown suspect from the application of facial recognition software, does not indicate that the video's quality was so poor that, once the suspect was identified, his firing of a weapon could not be observed in the video.  Notably, the FAC does not assert that someone who knows Norales could not recognize him as the shooter in the surveillance video.

At its core, the malicious prosecution claim asserts that the arrest complaint did not identify D.T. as the person who identified him as the shooter.  There was no obligation to include that information in the arrest complaint, and it was not misleading or "false" to omit it.  The omission of the witness's identity cannot serve as a basis for this malicious prosecution claim.

C. Denial of Fair Trial Based on Fabrication of Evidence

The defendant Detectives also move to dismiss the claim that they denied Norales a fair trial by fabricating evidence against him.  "The Due Process Clause guarantees a criminal

defendant's right to a fair trial." <u>Frost</u>, 980 F.3d at 244
(citation omitted).  This right is violated "[w]hen a police
officer creates false information likely to influence a jury's
decision and forwards that information to prosecutors."
<u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir.
1997).  Violations of a defendant's right to a fair trial are
redressable under § 1983.  <u>Id.</u>

Fair trial claims based on fabrication of evidence are
restricted to those cases in which an:

(1)  investigating official

(2)  fabricates information

(3)  that is likely to influence a jury's verdict,

(4)  forwards that information to prosecutors, and

(5)  the plaintiff suffers a deprivation of life, liberty,
or property as a result.

<u>Garnett v. Undercover Officer C0039</u>, 838 F.3d 265, 279 (2d Cir.
2016).  "[U]nlike a malicious prosecution claim, a Section 1983
claim for the denial of a right to a fair trial based on an
officer's provision of false information to prosecutors can
stand even if the officer had probable cause to arrest
the Section 1983 plaintiff."  <u>Frost</u>, 980 F.3d at 245 (citation
omitted).  "[A] prosecutor's decision to pursue charges rather
than to dismiss a complaint without further action may depend on
the prosecutor's assessment of the strength of the case, which

in turn may be critically influenced by fabricated evidence."
Id. at 248 (citation omitted).  Thus, a "deprivation of liberty
can result from the fabrication of evidence even if the initial
is lawful." McDonough v. Smith, 139 S. Ct. 2149, 2160 n.9
(2019) (citation omitted).

A plaintiff must allege causation when bringing claims
under § 1983.  See Roe v. City of Waterbury, 542 F.3d 31, 36 (2d
Cir. 2008).  A defendant's conduct must be a proximate cause of
the claimed violation in order to find that the defendant
deprived the plaintiff of his rights.  Higazy v. Templeton, 505
F.3d 161, 175 (2d Cir. 2007).  Proximate cause analysis under §
1983 incorporates common-law tort causation principles.  Id.

"[Q]ualified immunity is unavailable on a claim for denial
of the right to a fair trial where that claim is premised on
proof that a defendant knowingly fabricated evidence and where a
reasonable jury could so find." Morse v. Fusto, 804 F.3d 538,
550 (2d Cir. 2015).  "When a police officer creates false
information likely to influence a jury's decision and forwards
that information to prosecutors, he violates the accused's
constitutional right to a fair trial." Garnett, 838 F.3d at 275
(citation omitted).  "[T]here is a clearly established
constitutional right not to be deprived of liberty as a result
of the fabrication of evidence by a government officer acting in

an investigatory capacity." Id. (citation omitted). See also
Frost, 980 F.3d at 249.

Norales' fair trial claim rests on the allegation that the
officers created false evidence when they offered D.T. benefits
and used coercion to elicit D.T.'s identification of Norales as
the shooter. Norales also alleges that this claim rests on
Acevedo's false statement in the criminal complaint that the
surveillance video depicts Norales shooting a weapon.

For the reasons already explained, Norales' claim that
Acevedo's statements in the criminal complaint violated his
right to a fair trial fails. That theory relies on a series of
arguments without a sufficiently pleaded factual basis.

While the contours of the fair trial claim are still being
elucidated by our Court of Appeals, allegations that officers
threatened an eyewitness with arrest for crimes they had
committed and offered benefits to the eyewitness in exchange for
testimony, including leniency on pending charges, do not by
themselves state a claim. Here, there is no dispute that D.T.
was present at the shooting, knew Norales, identified him as the
shooter and selected his photograph from a photospread. As the
FAC also pleads, D.T. was independently interviewed by the ADA
to establish that there was indeed probable cause to arrest
Norales. D.T., represented by counsel, agreed to testify at
trial and did so, identifying Norales as the shooter. The FAC

indicates that at some point in her trial testimony, D.T. also testified that she did not know who the shooter was.  Taken together, the allegations in the FAC fail to state a claim that the defendant Detectives deprived Norales of his right to a fair trial.

The FAC has also failed to allege that the alleged fabrication of evidence against Norales was the proximate cause of his damages.  See Higazy, 505 F.3d at 175.  Before Norales was arrested, the ADA had already conducted two proffer interviews with D.T. and secured a proffer agreement.  Before Norales was indicted, D.T. testified in the grand jury.  The FAC does not plead that the ADA was "critically influenced" by the officers' conduct in making the key prosecutorial decisions.  See Frost, 980 F.3d at 248.  The FAC explains that the ADA was aware of all of the credibility issues associated with D.T.'s testimony.  And, of course, D.T. again identified Norales as the shooter during the trial.

Finally, Norales argues that this case is indistinguishable from Zahrey v. Coffey, 221 F.3d 342 (2d Cir. 2000), which held that a plaintiff, who also had been acquitted at trial, adequately stated a claim under § 1983 for denial of a right to a fair trial due to an alleged fabrication of evidence.  Id. at 348.  The relatively straight-forward allegations here of threats and benefits offered to an admitted eyewitness to a

violent crime are not equivalent to the complex allegations of a conspiracy to fabricate evidence that were found adequate in Zahrey.  Norales has not sufficiently pleaded that the defendant Detectives fabricated evidence that was the proximate cause of his incarceration.

   D. Conspiracy to Violate § 1983

      The defendant Detectives move to dismiss the conspiracy claim against them.  To survive a motion to dismiss a § 1983 conspiracy claim, Norales must "allege (1) an agreement between a state actor and a private party (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  Ciambriello v. Cty. of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002).  Complaints "containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient."  Id. at 325 (citation omitted).  A plaintiff alleging a § 1983 conspiracy must allege a predicate violation of constitutional rights.  See Droz v. McCadden, 580 F.3d 106, 109 (2d Cir. 2009); Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995).

      Norales' conspiracy claim under § 1983 is dismissed.  The FAC does not allege agreements among the defendant Detectives or between ADA and Acevedo with any specificity.  Rather, the

allegations of an agreement among the defendants are vague and conclusory.  Additionally, the FAC fails to plead a violation of Norales' constitutional rights.  Finally, the FAC does not allege a meeting of minds by the state actors and a private person to violate the plaintiff's constitutional rights.

E. Failure to Intercede

The defendant Detectives move to dismiss the final claim against them, which asserts that they failed to intervene to prevent a violation of Norales' rights.  A "police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."  Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997) (citation omitted).  Because the FAC fails to plead a violation of Norales' constitutional rights, it fails to plead a claim that any defendant failed to intervene to prevent that violation.

## Conclusion

The defendants' October 6, 2020 motions to dismiss are granted.  The Clerk of Court shall enter judgment for the defendants and close the case.

Dated:      New York, New York
            February 24, 2021        _____
                                          DENISE COTE
                                     United States District Judge